# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>CATHOLIC BISHOP OF NORTHERN ALASKA,<br><br>Debtor. | Case No.  F08-00110-GS<br>Chapter 11 |
| UNAATUQ, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LOUIS H. GREEN, and NANCY E. GREEN,<br><br>Defendants. | Adv. No. F11-90002-GS |

## MEMORANDUM ON MOTION TO ENFORCE JUDGMENT and MOTION FOR RULE 60(b) RELIEF

Plaintiff Unaatuq, LLC, has filed a *Motion to Enforce Judgment and Related Orders* ("*Motion*").  It seeks an order against the named defendants, Louis H. Green, Sr. and Nancy E. Green ("the Greens), as well as the Greens' two adult sons, Louis (Louie) Green, Jr. and Dewey (Stacey) Green, and Stacey's wife, Mary Reader, compelling them to vacate real property it purchased within the main bankruptcy case.[1]  These individuals assert that they have acquired title, by adverse possession, in some or all of the Pilgrim Hot Springs property that Unaatuq purchased from the debtor in a free and clear sale by auction held in March 2010 in *In re Catholic Bishop of Northern Alaska*, Main Case No. F08-00110-GS

---

[1] Those opposing the *Motion* generally break down into two groups.  Defendants Louis Sr. and Nancy E. Green are referred to herein as "the Greens."  Louie Jr., Stacey, and Mary are collectively identified as "the claimants."  "The Green family," as used herein, is a collective reference to all of these individuals.

("the Main Case").  Louie Jr., Stacey, and Mary oppose Unaatuq's *Motion*.  Stacey and Mary have also filed a *Request for Rule 60(b) Relief*.  For the reasons stated below, Unaatuq's *Motion* will be GRANTED, and the *Request for Rule 60(b) Relief* will be DENIED.

## BACKGROUND[2]

The debtor, Catholic Bishop of Northern Alaska ("CBNA"), filed a chapter 11 petition on March 1, 2008.  At the time of filing, CBNA owned 320 acres of real property located on the Seward Peninsula, north of Nome, Alaska, known as Kruzgamepa Hot Springs, Pilgrim Hot Springs, or the Pilgrim Springs Property ("the Property").  The Property was subject to a 99 year lease in favor of Pilgrim Springs, Ltd. ("PSL").  CBNA and PSL had entered the lease on November 1, 1969.  Under the terms of the lease, CBNA granted PSL the exclusive right to possess and develop the Property.  PSL was to pay a nominal amount of monthly rent to CBNA, but was to also pay CBNA a percentage of any gross revenues it received from certain development activities it planned to conduct on the Property.

During PSL's tenancy, Louis Green, Sr. ("Louis Sr."), and his family, lived on the Property for at least a portion of the time.  Louis Sr. wrote to CBNA in September 1992, to "clarify the situation" regarding his family's presence on the Property, and explain that PSL had asked him "and his family" to serve as caretakers of the Property from 1975 to the late

---

[2] This factual recitation is culled from the numerous orders, memoranda, and pleadings that have previously been entered in both the Main Case and this adversary proceeding.  The most pertinent of these are appended as exhibits to Unaatuq's pending *Motion to Enforce Judgment* (Docket No. 39).

1980's.[3]  The next month, CBNA wrote to its lessee, PSL, to express concern about the Greens' presence on the Property and confirm that they were not squatters.[4]  CBNA indicated that, if the Greens were squatters, "it would be [PSL's] responsibility as lease holder to procure the order [of eviction], especially since you are the ones who invited them on in the first place."[5]

PSL responded to CBNA in November 1992, expressly recognizing its status as a leasehold tenant.  Regarding the Green family, it wrote that "they were our first caretakers," the family had since broken up, but one of PSL's former directors had given Annie Green permission to stay in a small house on the Property.[6]  PSL indicated that, if Annie's presence on the Property "constitutes a squatter," it would "effect a suit based upon trespass," although it acknowledged having encouraged the farming operations.[7]  As to the rest of the Green family, PSL promised to "look into this further."[8]

In December 1992, CBNA responded to PSL, writing:

> As to the Green family, if one of your directors invited Annie Green to live on and help watch over the property after the Greens were no longer employed as caretakers, it seems to me that she and any others who visit her are guests of [PSL].  If she

---

[3] *See Decl. of Rev. Bowder*, filed Feb. 24, 2010 (Main Case Docket No. 710), Ex. A.  A copy of Bowder's *Declaration*, with its exhibits, is appended to Unaatuq's *Mot. to Enforce Judgment* (Docket No. 39). as Ex. 12.  A *Statement of Gross Receipts* dated Dec. 31, 1987, reflects that Louis Sr. and Annie Green "provided caretaker services in exchange for gardening privileges."  *Bowder Decl.*, Ex. G.

[4] *Bowder Decl.*, Ex. B.

[5] *Id.*

[6] *Id.*, Ex. C at 3.

[7] *Id.*

[8] *Id.*

3

was not invited to remain on the property, or if that invitation
has been ended, then she is a squatter and appropriate action
should be taken.  I will consider her your guest until you inform
me that another decision has been taken.[9]

Sometime after this exchange of correspondence, Louis Sr. again became PSL's caretaker.  He signed receipts from sharecropper farming operations for 1998 and 1999 which reference "Sharecropper/Caretaker Agreement - Louie Green, Sr., and Pilgrim Springs, Ltd."[10]  In correspondence dated September 29, 2006, to CBNA, PSL referred to "Louie Green" as its "man in the field."[11]  CBNA filed its bankruptcy petition roughly 18 months later.

After filing its chapter 11 petition, CBNA moved to terminate the PSL lease and recover possession of the Property.[12]  From the time that this motion was filed, and throughout the versions of the plan and disclosure statement that it submitted, CBNA made clear its intention to sell the Property free and clear of liens and interests under 11 U.S.C. § 363(f).  Louis Sr. was sent notice of CBNA's motion to terminate the lease as PSL's

---

[9] *Bowder Decl.*, Ex. D at 1.

[10] *Id.*, Ex. H.

[11] *Id.*, Ex. F at 2.

[12] *Mot. Pursuant to 11 U.S.C. §§ 541, 542 and 105 for an Order Approving (I) CBNA's Rescission and Termination of Lease, and (II) Requiring Former Tenant to Turnover Possession of Property*, filed Nov. 7, 2008 in the Main Case (Docket No. 278).

4

registered agent.[13]  The motion was granted on December 5, 2008.[14]  Three days before this

order was entered, the Greens filed *Proof of Claim No. 23* in the Main Case, as a general

unsecured claim for $263,143.00.  The claim was based upon "labor, equipment, operating

and transportation cost in connection with carrying-out duties as care-takers and agents at

Pilgrim Hot Springs" for PSL.[15]  The claim covered the time period from 1995 through 2008.

Louis Sr. described his position as "caretaker, farmer, on-site Nome Agent for Pilgrim Spring

LTD."[16]

　　　　After the PSL lease was terminated, the Greens sent an email to CBNA's business

manager, Thomas Buzek, with a proposal that Louis Sr. be permitted to stay on as a caretaker

for the Property.[17]  Louis Sr. noted that he had been PSL's caretaker from 1975 to 1985, and

again from 1994 to the present, and offered to stay on for CBNA under the same terms he

had with PSL – a non-salaried caretaker position.  CBNA declined this proposal.[18]  When

---

[13] *Am. Notice of Mot. and Hearing Pursuant to 11 U.S.C. §§ 541, 542 and 105 for an Order Approving (I) CBNA's Rescission and Termination of Lease, and (II) Requiring Former Tenant to Turnover Possession of Property*, filed Nov. 7, 2008 in the Main Case (Docket No. 280), at 5.

[14] *Order Granting Mot. Pursuant to 11 U.S.C. §§ 541, 542 and 105 for an Order Approving (I) CBNA's Rescission and Termination of Lease, and (II) Requiring Former Tenant to Turnover Possession of Property*, entered Dec. 5, 2008, in Main Case No. F08-00110 (Docket No. 306).

[15] *Proof of Claim No. 23-1*, filed Dec. 2, 2008 in the Main Case, at 2.

[16] *Id.*  PSL filed a separate claim that also referred to Louis Sr. as its caretaker, "resident agent," and sharecropper.  *Proof of Claim No. 21-1*, filed Dec. 2, 2008, in the Main Case, at 15, and Exs. 25, 28, 39, 43, and 47.

[17] *Dec'l of Thomas Buzek in Supp. of Debtor's Obj. to Certain Relief Requested in Notice of Appeal by Louis and Nancy Green (Buzek Dec'l)*, filed Feb. 5, 2010 in the Main Case (Docket No. 678), Ex. A.  A copy of Buzek's *Declaration*, with its exhibit, is appended to Unaatuq's *Mot. to Enforce Judgment* as Ex. 9.

[18] *Buzek Dec'l* (Docket No. 678), at 3.

Mr. Buzek, visited the Property in mid-June of 2009, he asked Louis Sr. to remove any items that belonged to him from the Property.[19]  According to Stacey and Mary Green, Mr. Buzek also inquired whether they would consider paying rent to CBNA.  Stacey and Mary "politely declined."  Shortly after Mr. Buzek's visit, the Greens withdrew their proof of claim.

Roughly five months later, on November 30, 2009, the Greens filed an *Opposition to the Sale of Pilgrim Hot Springs on Auction Block*.[20]  When this document was filed, there was no pending motion to sell the Property, but a hearing to consider the adequacy of a *Second Amended Disclosure Statement* had been noticed to the matrix, which included Louis Sr. and Nancy Green, but did not include Louie Jr., Stacey, or Mary.[21]  The *Disclosure Statement* discussed CBNA's plans to sell the Property, and its intention to wholly disallow any claims associated with the Property, including the Greens' claim.[22]  In their *Opposition*, the Greens stated that CBNA's representatives, in open meetings in Nome, had represented that the Property would not be sold.  The Greens also said the proposed auction would hurt the local community.

Although the Greens did not assert title to the Property in the *Opposition* itself, they attached a copy of a *Complaint to Quiet Title* that they had filed just five days earlier in the

---

[19] *Dec'l of Thomas Buzek in Supp. of Debtor's Obj. to Proof of Claim of Pilgrim Springs, Ltd.*, filed Aug. 10, 2009 in the Main Case (Docket No. 516), at 2.

[20] Main Case Docket No. 580.

[21] The disclosure statement hearing was noticed on November 3, 2009.  Louis Sr. and Nancy were listed on the matrix at this point in time, and were served with notice of the hearing.  *See* Main Case Docket Nos. 563, 564, 564-2 at 12.

[22] *Second Am. and Restated Disclosure Statement in Support of Debtor's Second Am. and Restated Plan of Reorganization*, filed Oct. 30, 2009 (Main Case Docket No. 561), at 13, 50-53, 63.

Alaska Superior Court at Nome.  In this complaint, the Greens alleged they had acquired title to the entirety of the Property by adverse possession, in that they had occupied the Property from 1975 to 1985, and from 1992 to 2009 in an actual, open, hostile, continuous, and exclusive manner.  The complaint did not name Louie Jr., Stacey, or Mary, as defendants, or otherwise mention them.

CBNA's attorneys wrote to the Greens and asked that the quiet title action be dismissed because it was filed in violation of the automatic stay.[23]  The Greens refused this request, and moved for entry of default judgment in the state court action.  CBNA filed an *Emergency Motion for Order to Show Cause Why Sanctions for Violation of the Automatic Stay Should not be Issued*.[24]  After a hearing, held January 15, 2010, the bankruptcy court granted the *Emergency Motion*.[25]  It found that the Greens had violated the automatic stay by filing the quiet title action, and by moving for entry of default judgment, against CBNA. The Greens were directed to dismiss the civil action, and CBNA was awarded its reasonable attorney's fees.  The Greens appealed this ruling to the United States District Court.

While the appeal was pending, the *Third Amended and Restated Joint Plan of Reorganization* was confirmed.[26] Under its terms, any claims that the Greens could assert

---

[23] *Debtor's Emergency Mot. for Order to Show Cause Why Sanctions for Violation of Automatic Stay Should not be Issued*, filed Jan. 8, 2010 (Main Case Docket No. 625), Exs. B - F.

[24] *Id.*

[25] *Order Granting Debtor's Emergency Motion for Order to Show Cause Why Sanctions for Violation of the Stay Should Not be Issued*, entered Jan. 21, 2010 in the Main Case (Docket No. 646).

[26] *Order Approving Third Am. and Restated Discl. Statement Submitted by CBNA and Confirming Third Am. and Restated Joint Plan of Reorganization*, entered Feb. 17, 2010 in the Main Case (Docket No. 689).

against CBNA or the Property were to be discharged and extinguished. Notice of the confirmation hearing, with copies of the pending plan and disclosure statement, were served on the matrix, including the Greens, but not Louie Jr., Stacey, or Mary.[27] The Greens did not object to plan confirmation.

On February 2, 2010, CBNA and the unsecured creditors committee filed a *Stipulated Motion to Approve Bid and Sale Procedures and Scheduling of an Auction Hearing Date for the Sale of Pilgrim Springs Property Free and Clear of Claims, Liens, Encumbrances and Interests Pursuant to the Plan and 11 U.S.C. § 363* ("*Motion to Sell*")*,* to sell the Property by auction on March 5, 2010, free and clear of liens, claims, encumbrances and other interests.[28] The *Motion to Sell* specifically identified the Greens as asserting a claim against the Property, and was served, by first class mail, on them.[29] A notice of the motion was also served on the Greens.[30] There is no mention of Stacey, Mary, or Louie Jr. in the *Motion to Sell,* and they were neither served with the motion, nor the notice. However, CBNA

---

[27] *Certificate of Mailing*, filed Dec. 23, 2009 (Docket No. 615).

[28] *Stipulated Mot. to Approve Bid and Sale Procedure and Scheduling of an Auction Hearing Date for the Sale of Pilgrim Springs Property Free and Clear of Claims, Liens, Encumbrances and Interests Pursuant to the Plan and 11 U.S.C. § 363*, filed Feb. 2, 2010 (Main Case Docket No. 671).

[29] *Id.*

[30] Main Case Docket No. 673.

8

published notice of the proposed sale in 12 Alaska publications, including the Nome Nugget.[31]

On February 22, 2010, the Greens filed a *Motion for Preliminary Injunction* in the Main Case, seeking to stay the sale of the Property,[32] but they did not file an objection to the underlying *Motion to Sell.* They sought injunctive relief based upon their possession of the Property in an "open, notorious, continuous, exclusive manner consistent with rural property in Alaska which was hostile to CBNA as the recorded owner of the property."[33]  In their motion, the Greens did not mention that their sons, or their families, might also claim an interest in the Property, and they failed to serve their *Motion for Preliminary Injunction*, or its supporting memorandum of law, upon Stacey, Mary, or Louie Jr.

CBNA submitted the *Declaration of Deacon George W. Bowder* as part of its opposition to the *Motion for Preliminary Injunction*.  Rev. Bowder began work with CBNA in 1978, and became the director of finance for CBNA in 1984.  In his capacity as director of finance, he was responsible for the administration of CBNA's business and the operation of its assets, including the Property.  Rev. Bowder testified that:

---

[31] *Certificate of Electronic Mailing and Publication of Notice of Auction of Pilgrim Hot Springs Property*, filed Mar. 11, 2010 (Main Case Docket No. 734-1).  Copies of the published notices are not included in the Main Case record.  However, Stacey, Mary, and Louie Jr. do not dispute that notice of the sale was published in the publications identified at Docket No. 734.  "The party objecting to service has the burden of proving a *prima facie* error in service."  *Doolittle v. County of Santa Cruz (In re Metzger)*, 346 B.R. 806, 815 (Bankr. N.D. Cal. 2006).

[32] *Mot. for Prelim. Injunction to Stay the Sale of Pilgrim Hot Springs*, filed Feb. 22, 2010 (Main Case Docket No. 703).

[33] *Memo. of Law in Supp. of Appellants' Mot. for Prelim. Injunction*, filed Feb. 22, 2010 (Main Case Docket No. 704) at 1.

9

1.    CBNA leased the Property to PSL.

2.    PSL "employed or had some other contractual relationship with, Louis and Nancy Green as caretakers of Pilgrim Springs."

3.    From the time he began working for CBNA in 1978 he was aware that the Greens occupied the Property with CBNA's permission "in their capacity as employees of CBNA's lessee."

4.    "CBNA dealt with the Greens in all respects as employees of its lessee who occupied Pilgrim Springs with CBNA's consent and permission."

5.    The Greens never disputed that they "were employed, or otherwise obligated under some contractual relationship with, Pilgrim Springs Limited as CBNA's lessee."

6.    Prior to the quiet title action, the Greens had never challenged CBNA's title to the Property.[34]

CBNA also offered the declaration of its current business administrator, Thomas Buzek, in opposition to the *Motion for Preliminary Injunction*.[35]  Mr. Buzek's declaration is consistent with that of Reverend Bowder's, though it goes back only 10 years.  Mr. Buzek's declaration discusses, and attaches a copy of, Louis Sr.'s written requests to continue as caretaker of the Property made to CBNA after rejection of PSL's lease in the Main Case.[36]

The court held a hearing on the Green's *Motion for Preliminary Injunction* on February 26, 2010, at which Louis Green, Sr. testified.  The court denied the motion.  In its *Memorandum on Greens' Motion for Preliminary Injunction*, the court reviewed in detail the

---

[34] *Decl. of Rev. Mr. George W. Bowder in Sup. Of Debtor's Obj. to Certain Relief Requested in Notice of Appeal of Louis and Nancy Green* filed Feb. 5, 2010 (Main Case Docket No. 709) at 3-4. A copy of Rev. Bowder's *Declaration* is appended to Unaatuq's *Mot. to Enforce Judgment* as Ex. 8.

[35] *Buzek Dec'l* (Docket No. 678).

[36] *Id*., Ex. A.

evidence submitted on the merits of the Greens' adverse possession claims. The court concluded that PSL, as lessee of the Property, had permitted the Greens to occupy and use the Property as its caretakers and agents.[37] After reviewing the evidence, the court found that "the Greens' likelihood of success on their adverse possession claim is less than negligible."[38]

The Greens proceeded to seek the same injunctive relief within their pending appeal to the United States District Court. On March 4, 2010, the day before the scheduled auction, the District Court entered its *Amended Order* denying their request to stay the sale of the Property.[39] The District Court concluded that the Greens' adverse possession claim had been postponed or tolled as to CBNA until the lease with PSL was terminated and CBNA acquired a possessory interest in the Property:

> It appears from the record in this case that it is undisputed that during most, if not all, the time that the Green's claim they were in adverse possession, the Pilgrim Hot Springs property was subject to a leasehold in favor of Pilgrim Springs, Ltd. As the lessee, Pilgrim Springs, Ltd., not the Catholic Bishop of Northern Alaska ("CBNA"), held the possessory interest in the real property. CBNA held a reversionary or future possessory interest. To the extent that the Green's possession was hostile, it was hostile to the possessory interest of Pilgrim Springs, Ltd., not the lessor, CBNA, who had no existing possessory interest. Under the principles of common law, the running of a limitation period that operates as vesting title by adverse possession is postponed or tolled until the interest becomes possessory. This

---

[37] Main Case Docket No. 716, at 12.

[38] *Id.* at 13.

[39] *Mem. Decision*, entered Oct. 19, 2010, in USDC Appeal No. 4:10-cv-00004-RRB (Main Case Docket No. 815), at 7-8 (citations omitted).

rule logically followed the rule that the holder of a future
possessory interest could not bring an action in ejectment. Both
versions of AS § 09.10.030 clearly codify the latter rule.[40]

The District Court concluded that "the Greens can not establish any realistic
probability that they may prevail on the merits under either their lack of jurisdiction
argument or their argument under Alaska law."[35]

On March 5, 2010, CBNA auctioned the Pilgrim Hot Springs Property. Unaatuq was
the successful bidder. An *Order Approving Sale of Pilgrim Springs Property* ("the *Sale
Order*") was entered April 26, 2010.[36] The *Sale Order* noted that the Greens did not object
to the sale, and that their adverse possession claim had been overruled by both the
bankruptcy court and the District Court. It further provided that the sale to Unaatuq would
be free and clear of all claims or charges of any kind, "including any claims to title to the
Pilgrim Springs Property by Louis Green Sr. and Nancy Green."[37]

In December 2010, after plan confirmation, completion of the sale of the Property to
Unaatuq, and the conclusion of the appeal, the Greens filed a second quiet title action in
Nome Superior Court, naming Unaatuq and other entities, but not CBNA, as defendants.[38]
The Greens alleged that the Property was quitclaimed by CBNA to Unaatuq over their

---

[40] *Am. Order*, entered Mar. 4, 2010 in USDC Appeal No. 4:10-cv-00004-RRB (appended to
Unaatuq's *Motion*, Docket No. 39, as Ex. 4), at 4-5 (citations omitted).

[35] *Id*. at 5.

[36] Main Case Docket No. 754.

[37] *Id.* at 6.

[38] Docket No. 7.

12

objection, and that the District Court had given them leave to file the complaint. As in their prior quiet title complaint, the Greens alleged they had acquired title to the Property by adverse possession, having occupied the property from 1975 to 1985, and again from 1992 to 2009, in actual, open, hostile, continuous, and exclusive possession. Yet, they again failed to name, or mention, any interests asserted by their sons or their families.

Unaatuq promptly initiated this adversary proceeding against the Greens. Its *Complaint to Enforce Orders, Determine Validity of Interest, and for Injunctive and Declaratory Relief* alleged that the Greens had violated the *Sale Order*, the confirmation order, and the terms of the confirmed plan by filing the quiet title action. It asked that the court enforce the *Sale Order*, determine that the Greens had no right, title or interest in the Property, and enjoin the Greens from asserting such claims. The *Complaint* asked that any cloud on Unaatuq's title to the Property be removed, and that Unaatuq be awarded its fees and costs. It also requested sanctions to deter the Greens from making claims against the Property in the future.

The Greens moved to dismiss Unaatuq's *Complaint*, with prejudice. Their motion was denied, and Unaatuq's *Motion for Summary Judgment* was granted.[39] The *Judgment*, entered on March 30, 2011, decreed that the Greens had "no right, title, claim or interest in, and are forever barred from asserting any claim in" the Pilgrim Springs Property.[40] It further decreed that Unaatuq owned the Property free and clear of any claim or interest of the

---

[39] *Order Granting Mot. for Summ. Judgment*, entered Mar. 30, 2011 (Docket No. 21); *Judgment*, entered Mar. 30, 2011 (Docket No. 22).

[40] *Judgment*, entered Mar. 30, 2011 (Docket No. 22), at 1.

13

Greens.[41]  Paragraph 8 of the *Judgment* permanently enjoined not only the Greens, but also their successors and assigns:

> from asserting any right, title, claim or interest in Pilgrim Hot Springs based on, or arising from, facts existing prior to the date of this Judgment, and from taking any action in violation of the confirmed plan of reorganization, the order confirming the plan of reorganization, or the order approving sale of Pilgrim Hot Springs by the Debtor CBNA to Unaatuq, LLC.[42]

### THE MOTION TO ENFORCE JUDGMENT

Unaatuq has filed its *Motion to Enforce Judgment and Related Orders,* which advises that it "has run into a problem" with its efforts to develop the Property because the Greens and their family members refuse to vacate cabins located on the Property.[43]  It asks that the court order the Green family members to vacate the property, and to issue any writs of assistance that may be necessary to complete the sale.  Unaatuq seeks relief not only against Louis Sr. and Nancy, but other family members remaining on the property as well, namely Louis Green, Jr., and Stacey Green, who are the Greens' adult sons, and their "respective spouses."

In response to the *Motion*, the Greens filed a letter in which they complain of poor road conditions to the Property and that Unaatuq did not give them enough notice of the need

---

[41] *Id.* at 2.

[42] *Id.* at 3-4.

[43] *Pl.'s Mot. to Enforce Judgment and Related Orders*, filed Aug. 23, 2014 (Docket No. 39), at 2. This motion was initially filed in the Main Case (Main Case Docket No. 865).  The court deferred ruling on that motion pending the correction of certain procedural deficiencies, and required Unaatuq to seek relief in the instant adversary proceeding to enforce the *Judgment*.  *See Order Deferring Ruling on Mot. to Enforce Sale and Related Orders*, entered Aug. 22, 2013 in the Main Case (Docket No. 867).

to move their possessions.[44]  The letter does not reassert their adverse possession claim or otherwise state that the Greens have a right to stay on the Property.

The Greens' adult sons, Louie Green, Jr. and Stacey Green, and Stacey's wife, Mary Reader (collectively, "the claimants"), oppose the *Motion*.[45]  They argue that they have independently acquired title to portions of the Property by adverse possession prior to the time of the free and clear sale to Unaatuq.  They ask the court to find that the *Sale Order* and *Judgment* are void as to their interests in the Property because they were never given notice, and that they be permitted to litigate their claims in state court.

Unaatuq responds by arguing that the claimants were not known to be creditors or parties holding affirmative claims against the Property.  It contends that they received constructive notice of the proposed sale, by virtue of a notice that was published in the Nome Nugget and other Alaska publications in February 2010.  Unaatuq contends publication notice was sufficient in light of their unknown interest in the Property at the time of plan confirmation and the subsequent sale of the Property.  It characterizes the claimants as squatters who, having no record interest in the Property, lack property rights protected by the due process clause of the Fifth Amendment.

Further, relying on the District Court's ruling, Unaatuq argues that the children do not have facially valid claims.  Common to all the adverse possession claims, whether asserted

---

[44] *Letter from Louis H. Green and Nancy Green*, filed Sept. 10, 2013 (Docket No. 41).

[45] *See Opp'n to Mot. to Enforce Judgment and Related Orders and Request for Rule 60(b) Relief*, filed Oct. 2, 2013 by Stacey and Mary (Docket No. 51);  *Opp'n to Mot. to Enforce Judgment*, filed Oct. 2, 2013 by Louie Jr. (Docket No. 52).  Stacey's and Mary's opposition expressly incorporates a request for Rule 60(b) relief.  Although not referenced in the caption, Louie Jr. includes a similar request within his opposition as well.

by the Greens or the claimants, is that fact that the purported hostile occupancy period occurred while the PSL lease was in effect.  Because of this, Unaatuq urges this court to apply the District Court's ruling – that the Greens' adverse possession period was "postponed or tolled" as to CBNA until its interest in the Property became possessory, on termination of the PSL lease – to the claimants.

In a *Surreply*, Stacey and Mary argue that constructive notice is insufficient as to their interests because CBNA knew they had a cabin on the property, and that they occupied that cabin, before the Property was sold.  They also contend the District Court's ruling is incorrect and that their interest in the property automatically vested at the expiration of the statutory period, prior to the time CBNA filed for bankruptcy.  They say their ownership interest in a portion of the Property entitled them to actual notice of the sale of the Property, and it would be a denial of due process if the *Sale Order* or *Judgment* were enforced against them.

## DISCUSSION

This is the second time Unaatuq has returned to this court to seek relief with regard to the sale of the Property.  Unaatuq requests that the court enter an order compelling the Green family to vacate the Property based upon the sale free and clear of all liens, encumbrances and interests.  Although the sale occurred in April 2010, and the Main Case has been closed since November 19, 2010, the court retains jurisdiction to construe its own

16

orders.[46]  Pursuant to Fed. R. Civ. P. 70, made applicable herein by Fed. R. Bankr. P. 7070,

the court has the authority to issue writs of assistance in furtherance of a judgment.

## I.      Relief is Appropriate Against the Greens.

The Greens' response to Unaatuq's *Motion* does not seek to relitigate their claims for

adverse possession.  Rather, they point out that the roads were such that it was not possible

to remove their possessions.  I do not read the Greens' response as objecting to the relief

sought – that they must vacate the Property.  Rather, their response goes only to the timing

of when they must do so.  As such, Unaatuq is entitled to the relief requested against the

Greens, with reasonable accommodations for the practicalities of removing property from

a remote area of Northwest Alaska.  If the parties cannot agree as to the time by which the

Greens shall remove their property, they may request a hearing on the limited issue of the

timing by which removal must be accomplished.

## II.     Enforceability of the Sales Order Against the Claimants.

The true opposition to Unaatuq's *Motion* comes from Louie Jr., Stacey, and Mary.

They claim ownership of two separate, but undefined, portions of the Property as a result of

their purported independent, open, hostile, and exclusive possession of those portions.  In

contrast to the Greens, they did not receive actual notice of the bankruptcy or CBNA's

proposed sale of the Property free and clear of interests.  They argue that, because they were

denied notice and an opportunity to be heard, the sale is void as to their interests.  Unaatuq

contends that the *Judgment* extends to the claimants as successors or assigns of the Greens.

---

[46] *Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1135 (9th Cir. 2010) (citing *Beneficial Trust Deeds v. Franklin (In re Franklin)*, 802 F.2d 324, 326-27 (9th Cir. 1986)); *Doolittle v. County of Santa Cruz (In re Metzger)*, 346 B.R. 806, 809 (Bankr. N.D. Calif. 2006) (court retained jurisdiction to interpret a sale order it had entered 14 years earlier).

### A.    The Claimants are Not Subject to the Terms of the *Judgment* as Successors or Assigns.

Unaatuq's *Motion to Enforce* cannot be granted against Louie Jr., Stacey, and Mary based upon the language of the *Judgment*.  Their adverse possession claims are not derived from the Greens' claims.  Rather, they raise independent claims of adverse possession, based upon their entry onto the property as adults.  Thus, the *Judgment* cannot be enforced against them as the Greens' successors and assigns.  But, this does not end the court's inquiry.  It must again construe the *Sales Order* to determine whether CBNA sold the Property free and clear of the claimants' purported independent ownership interests.

### B.    Have the Claimants Established an Interest in the Property that Required Notice of the Proposed Sale under § 363(f).

Undoubtedly, parties holding known liens or asserting known interests in property to be sold are entitled to actual notice of a debtor's intent to sell such property free and clear of those interests.[47]  This is required by the Bankruptcy Code[48], the bankruptcy rules[49], and the due process clause of the Fifth Amendment.[50]  "These interrelated Code sections and Rules have been deliberately crafted to provide procedural assurance that a party holding or claiming an interest in real property in a debtor's estate will receive timely notice of the intention to sell specific property free and clear of liens."[51]  Generally, the failure to give

---

[47] *Metzger*, 346 B.R. at 815 ("Holders of liens that may be adversely affected are entitled to *unambiguous notice* and an adequate opportunity to respond.") (emphasis in original).

[48] 11 U.S.C. § 363(b)(1) and (f).

[49] Fed. R. Bankr. P. 6004(c), 7004, and 9014.

[50] *Citicorp Mortg., Inc. v. Brooks (In re Ex-Cel Concrete Co., Inc.)*, 178 B.R. 198, 203 (B.A.P. 9th Cir. 1995)(citing *Mullane v. Central Hanover Bank & Trust Co.),* 339 U.S. 306, 314 (1950)).

[51] *Metzger*, 346 B.R. at 815 (citing *Ex-Cel Concrete*, 178 BR at 203).

18

proper notice to a party in interest voids the action.[52]  Within the context of bankruptcy sales, however, the failure to provide a party in interest with adequate notice of the estate's intent to sell property free and clear of an interest may render the sale subject to that interest.[53]

Ordinarily, liens and interests in real property are recorded, and therefore, easily known for purposes of determining and evaluating adequate notice of sales free and clear under 11 U.S.C. § 363(f).  In this instance, there is a question whether Louie Jr., Stacey, or Mary, hold any interest in the Property that entitled them to receive actual notice prior to the sale.  In matters arising under § 363, including sales free and clear under § 363(f), "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."[54]  The claimants have failed to satisfy this burden.

Louie Jr., and Stacey and Mary, contend that they owned portions of the Property at the time of the sale, acquired through adverse possession.  Under Alaska law, they must prove "that for the statutory period '[their] use of the land was continuous, open and notorious, exclusive and hostile to the true owner.'"[55] The applicable statutory period for

---

[52] *Ex-Cel Concrete*, 178 B.R. at 203 (citing *In re Center Wholesale,* 759 F.2d 1440, 1448 (9th Cir. 1985)).

[53] *Metzger*, 346 B.R. at 819.

[54] 11 U.S.C. § 363(p)(2).

[55]  *Nome 2000 v. Fagerstrom,* 799 P.2d 304, 309 (Alaska 1990)(quoting *Smith v. Krebs,* 768 P.2d 124, 125 (Alaska 1989)).

adverse possession is 10 years.[56]  Additionally, the claimants must prove adverse possession by clear and convincing evidence.[57]

Stacey and Mary support their *Opposition* with affidavits and photographs.[58]  The affidavits establish that both Stacey and Mary are residents of Nome.[59]  Stacey says he moved out of his parents' home in 1980, when he was 17 years old.[60]  Stacey states in his affidavit that he "selected the site where Mary and I built a cabin on the Pilgrim Springs property in 1989 or 1990."[61]  He and Mary did not ask anyone for permission to build the cabin, although Stacey did ask his father, Louis Sr., if it would be possible for him to become a caretaker on the Property.  His father said "no," and discouraged Stacey from contacting PSL directly about this.  Stacey said he decided, after this conversation, to go ahead and build a cabin at the site he had selected, which was "removed from any other parts of the property that have buildings and other improvements."[62]  Stacey and Mary say they have

---

[56] *Id.*; AS 09.10.030.  In 2003, Alaska amended its adverse possession statutes, AS 09.10.030, and AS 09.45.052 to limit the applicability of adverse possession.  *See generally,* Jennie Morawetz, *No Room for Squatters: Alaska's Adverse Possession Law*, 28 Alaska L. Rev. 341, 361-64 (2011).  Only Stacey has provided any evidence as to when his adverse possession claim began.  Although equivocal, it arguably began around 1990, and would have concluded prior to the amendment of the Alaska statutes.  For purposes of this analysis, I assume that it is governed by the statutes prior to the 2003 amendments.

[57] *Nome 2000*, 799 P.2d. at 309.

[58] Docket No. 51.  Louie Jr.'s *Opposition* stated that an affidavit "outlining his period of ownership in greater detail" would be filed in the "near future."  (*See* Docket No. 52 at 4 n.1).  To date, his affidavit has not been filed.

[59] *Aff. of Dewey "Stacey" Green* (Docket No. 51-1), at 2; *Aff of Mary Reader* (Docket No. 51-2), at 2.

[60] *Stacey Aff.*, Docket No. 51-1, at 2.

[61] *Id.*

[62] *Id.*

20

used the cabin, along with trails that they have created, as their own. They also say that they do not visit the Greens, and rarely even see them, when staying at the cabin.

Although Stacey selected the site for his cabin in 1989 or 1990, it is unclear what exactly this means, or how it supports his claim for adverse possession. From the balance of the affidavit, he decided sometime later to "go ahead and build a cabin," but he does not state when construction began or was finished. Stacey and Mary both say they never received notice about a court hearing for the sale of the Property, and if they had, they would have objected. Both Stacey and Mary also describe a conversation with CBNA representative Thomas Buzek in 2009 in which they "politely declined" his inquiry as to whether they would pay rent.

Louie Jr. has not provided an affidavit or declaration in support of his claim of adverse possession. His opposition states that at the time of the bankruptcy sale, he "placed a cabin on his property near the airport on the Pilgrim Springs property and was in actual possession of a portion of the property."[63] Louie Jr. does not state when he built the cabin, or describe his use of the property. Rather, he simply argues that "it was apparent that Catholic Bishop of Northern Alaska ("CBNA") had actual knowledge of the fact that Louie Jr., placed a cabin on his property near the airport on the Pilgrim Springs property and was in actual possession of a portion of the property when it sought approval from this Court for the sale of the Pilgrim Springs property free and clear of all liens."[64]

---

[63] *Opp'n to Mot. to Enforce Judgment* (Docket No. 52), at 2.

[64] *Id.*

21

Neither Louie Jr., nor Stacey and Mary, provide specific information regarding the dates when their adverse possession began. It is unclear from Stacey's affidavit exactly what happened, or when construction began. Moreover, their polite declination to pay rent to CBNA after it had just terminated PSL's lease, alone, is not a repudiation of CBNA's ownership.[65] Even if it was, it occurred in 2009, either too late to commence, and vest, a period of adverse possession as to CBNA, or years after they had already acquired title through adverse possession. If the latter, one would expect an outright declaration of their ownership interest in response to a request to pay rent for property they purportedly owned.

Louie Jr. has provided argument, but no facts, to support his adverse interest claim. Additionally, the claimants have failed to define which portions of the Property they adversely possessed. Their failure to detail the dates their adverse possession began, and the property adversely possessed, alone precludes a finding that any of them owned a portion of the Property through adverse possession at the time of the sale. Even if the court were to overlook these shortcomings, the evidence presented establishes that the Claimants cannot establish adverse possession under Alaska law.

### 1.    The Claimants' Adverse Possession Claims Were Tolled as to CBNA While PSL's Lease was in Effect.

The District Court concluded that the Greens had no "realistic probability" of succeeding on their adverse possession claim, and denied their motion for injunctive relief, because "under the principles of common law, the running of a limitation period that operates as vesting title by adverse possession is postponed or tolled until the interest becomes

---

[65] *Glover v. Glover*, 92 P.3d 387, 393 (Alaska 2004).

22

possessory."[66]  The court relied upon the Restatement (First) of Property, § 222 (1936), which provides that, absent one of three exceptions not applicable to this case, "[i]n actions to recover possession of land or to establish title to interests therein brought by the owner of a legal estate which is or at one time was a future interest, *the statutory period does not commence to run before such estate becomes a present interest*."[67]  This is because, upon CBNA's lease of the Property, the exclusive right to possession transferred to PSL, as lessee, for the duration of the lease.[68]  Once leased, the landlord lacks the legal right to maintain actions for trespass or ejectment to challenge another's right to possession of the property.[69]  As a result, any claims of adverse possession arising during the lease period attach only to the lease, and not the fee simple ownership.

The claimants contend that the District Court erred in applying the common law to toll the running of any adverse possession claims for the duration of the lease.  They argue that the statutory adverse possession period began to run despite the lease because CBNA always held title to the property.  This misses the fundamental policy advanced by the common law.

_____

[66] *Am. Order*, entered Mar. 4, 2010 in USDC Appeal No. 4:10-cv-0004-RRB (appended to Unaatuq's *Motion*, Docket No. 39, as Ex. 4), at 4 (citing Restatement (First) of Property § 222 (1936).

[67] Restatement (First) of Property § 222 (emphasis added); *see also* 16 *Powell on Real Property* § 91.12 (2006).  *See generally Dieterich Int'l Truck Sales, Inc. v. J.S. & J. Serv., Inc.,* 3 Cal. App. 4th 1601, 1608, 5 Cal. Rptr. 2d 388, 392 (1992)("A future interest, such as a landlord's reversion cannot be the subject of a prescriptive easement because the statutory period for acquiring the easement runs only against a possessory interest.").

[68] Restatement (Second) of Property: Landlord & Tenant § 1.2 (1977)("A landlord-tenant relationship exists only if the landlord transfers the right to possession of the leased property."); *See Lewis v. Jaeger,* 818 N.W.2d 165, 187 (Iowa 2012)("A tenant's right to possession is generally exclusive, and the tenant, not the landlord, has legal control of the leased premises."); *In re American Legion Post No. 81,* 255 P.3d 31, 33 (Kan. App. 2011); *Monarch Accounting Supplies, Inc. v. Prezioso,* 368 A.2d 6, 9 (Conn. 1976).

[69]  25 Am. Jur. 2d *Ejectment* § 1 (2014)("ejectment is an action filed by a plaintiff who does not possess the land but has the right to possess it, against a defendant who has actual possession."); 75 Am. Jur. 2d *Trespass* § 18 (2014)(The essence of a trespass to real property is the injury to the right of possession.").

Divested of the present right to possession, the landlord/owner lacks standing to maintain a legal challenge to anyone asserting possession – that cause of action belongs exclusively to the lessee.[70]  Unable to presently enforce its future right of possession, the law does not permit one to adversely possess that which cannot be defended.

Louie Jr., Stacey and Mary could not commence a period of adverse possession against CBNA while PSL's lease was in effect.  Their adverse claims as to CBNA's interest in the Property did not start until CBNA rejected PSL's lease in 2009.[71]  Therefore, as of March 5, 2010, when CBNA sold the Property, the statutory period necessary for the claimants to acquire ownership through adverse possession had not yet run.

### 2.    The Claimants Cannot Establish the Element of Hostility.

The new claims for adverse possession also suffer the same factual shortcomings as the Greens' claims.  The claimants cannot establish that their possession was hostile for the same reasons that the Greens could not: until 2009 they were on the Property with the permission of CBNA's lessee, PSL.  Moreover, throughout the Green family's use of the Property, the evidence shows that PSL was aware of, and permitted, its use.

The Alaska Supreme Court has instructed that "[h]ostility is . . . determined by application of an *objective* test which simply asks whether the possessor 'acted toward the land as if he owned it,' without the permission of one with legal authority to give

---

[70] *See Dieterich Int'l Truck Sales, Inc.,* 3 Cal. App. 4th at 1609-10 (detailing differences between an owner's ability to bring a suit to protect ownership interest and suits to protect possessory interests, where the affected property has been leased.)

[71] The lease was terminated upon its rejection.  11 U.S.C. § 365(h)(1)(A)(i).

possession."[72]  Permission to use the property precludes a claimant from establishing hostile possession for purposes of adverse possession.  In *Glover v. Glover*,[73] the Alaska Supreme Court examined just such a situation.  Mary Johnson owned property in Kotzebue that was divided into north and south lots.  In 1954 or 1955, Ms. Johnson agreed to let Dan Snyder, Sr. live on the south lot in exchange for providing her with game.  The property passed to Ms. Johnson's relatives until Billy Glover conveyed the southern lot to Rotman Stores, Inc. in 1965, who then conveyed the lot to the Maxsons in 1969.  To make things confusing, in 1975 the Maxsons conveyed the south lot back to Glover, in exchange for the north lot. Throughout this time, the Snyder family lived in a house built by Mr. Snyder on the south lot. The family later constructed a shed and an addition onto the house.  Mr. Snyder's son, Carl, "succeeded to his interest in the property."[74]

Upon Billy Glover's death, his daughter brought a quiet title action in anticipation of selling the property.  Carl Snyder asserted ownership of the south lot through adverse possession.  The trial court found that: (1) Ms. Johnson had granted Dan Snyder, Sr. permission to live on the property, and such permission precluded any claims of adverse possession while held by her or her successors; (2) the permissive nature of the occupancy terminated upon the first sale of the south lot, and (3) upon termination of permission, Snyder's occupancy became hostile for purposes of establishing ownership through adverse possession.

---

[72] *Nome 2000*, 799 P.2d at 310 (emphasis in original)(quoting *Hubbard v. Curtiss,* 684 P.2d 842, 848 (Alaska 1984)).

[73] 92 P.3d 387 (Alaska 2004).

[74] *Id*. at 390.

25

On appeal, the Alaska Supreme Court agreed that Dan Snyder's permissive use of the property as a tenant could not constitute hostile possession for purposes of adverse possession.[75]  Moreover, it held that "[w]hen one assumes possession of another's property, there is a presumption that he does so with the rightful owner's permission and in subordination to his title."[76]  The Alaska Supreme Court construed the original agreement between Ms. Johnson and Dan Snyder.  Though it did not disturb the trial court's conclusion that the lease terminated upon the first sale of the south lot, it noted that the validity of that transfer was a question to be determined on remand.  The Court held that regardless of the transfer, "when possession begins with the true owner's permission, it cannot become hostile unless the presumption of permission 'is rebutted by proof of a distinct and positive assertion of a right hostile to the owner of the property.'"[77]  Specifically, it held that where the claimant originally entered the land as a tenant, he or she "must usually show some distinct act, like an open announcement of his claim or a change in his use of the land sufficient to serve as a distinct and positive assertion of his claim to own the property."[78]  The Court explained that "stronger evidence than usual" was required of those who originally entered with permission, to establish an adverse claim.[79]  But, it also noted that "when the acts of ownership are overt and unambiguous and the exclusive possession is long held, a factfinder may infer that the

---

[75] *Id*. at 392.

[76] *Id*.

[77] *Id*.

[78] *Glover*, 92 P.3d at 394.

[79] *Id.*

26

tenant has repudiated his landlord's claim of ownership and asserted his own."[80]  Because

the trial court did not make specific findings regarding repudiation, the Alaska Supreme

Court remanded the matter.

Here, the evidence presented shows that the Green family possessed and used the

Property with the permission and consent of PSL.  This is the same evidence Judge

MacDonald considered in addressing the Greens' motion for injunctive relief to stay the sale

of the Property.  Judge MacDonald concluded,

> The documentary evidence which CBNA has provided in
> its opposition and supplemental opposition strongly refutes their
> claim of adverse possession. The correspondence, e-mail
> exchanges, and receipts produced by CBNA establish that the
> Greens were caretakers of and sharecroppers on the Pilgrim
> Springs property. They were on the property at the request of
> CBNA's lessee, Pilgrim Springs, Ltd., and CBNA took steps to
> receive assurance from its lessee that the Greens were on the
> property in these capacities rather than as squatters.
>
> Representations made in this case by Pilgrim Springs,
> Ltd., indicate that CBNA's lessee considered Mr. Green to be its
> agent and caretaker, as well. Arthur Neuman, Pilgrim Springs,
> Ltd.'s director and secretary treasurer, filed Proof of Claim
> No. 21 on December 2, 2008. In his narrative describing the
> nature of the claim, Neuman described Mr. Green as "Pilgrim
> Springs' caretaker and sharecropper" and also indicated Green
> assisted in writing grants for Pilgrim Springs, Ltd.  A copy of a
> letter from Neuman to CBNA dated August 3, 2008, describes
> Mr. Green as "our resident agent."[81]

---

[80] *Id.*

[81] *In re Catholic Bishop of Northern Alaska,* 9 ABR 346, 351-52, 2010 WL 7506092, at *3 (Bankr.
D. Alaska Feb. 26, 2010).  In reaching his conclusion that the  PSL had allowed the Green family to occupy
and use the Property, Judge MacDonald relied upon the same  declarations and exhibits from Thomas Buzek
and George Bowder that Unaatuq has attached to its *Motion.*

27

Having reviewed the same declarations and exhibits, I reach the same conclusion: PSL allowed the Green family, including Louie Jr., Stacey and Mary, to occupy and use the Property throughout its lease term.  While Judge MacDonald focused upon the litigants before him, Louis Sr. and Nancy, the same letters between CBNA, PSL, and Mr. Green, show that PSL was aware of, and consented to, the family's presence on the Property.[82] Much of the correspondence is from 1992, *after* Stacey says he selected the site for, and built, his cabin.  Having received permission from PSL to stay on the Property as members of the Green family, the claimants' possession was not hostile for purposes of establishing adverse possession.  It is clear that they received permission from PSL, as part of the Green family, to use and occupy the Property, which included the construction of structures such as cabins, trails, and bridges.

Further, whereas the Greens openly repudiated any permissive use by declaring their claims for adverse possession in a quiet title action, the claimants never undertook any similar acts.  Rather, when CBNA asked Stacey and Mary if they would "consider the possibility of paying rent" for their cabin, they "politely declined."[83]  This dialogue does not reflect a repudiation of CBNA's ownership, nor does it constitute an unequivocal assertion of their ownership.  Rather, it expresses a desire to remain at the *status quo* prior to rejection of PSL's lease – where they were allowed to have a cabin on the Property without paying for it.  Although the claimants may have possessed portions of the Property for a lengthy period

---

[82] The same letters on which Judge MacDonald relied are attached to *Bowder Declaration*, Exs. A - F, and form the basis for some of the factual discussion in the Background section of this *Memorandum.*

[83] *Aff. of Dewey "Stacey" Green* (Docket No. 51-1), at 2; *Aff. of Mary Reader* (Docket No. 51-2), at 2.

of time, they did so with PSL's permission.  This precludes them from establishing the requisite hostility to sustain a claim for adverse possession.

### 3.    The Claimants Cannot Establish Notorious or Exclusive Possession Necessary for Adverse Possession.

The Alaska Supreme Court has described the requirements of continuity, notoriety, and exclusivity as the physical requirements of the adverse possession doctrine.[84]  The claimants rely heavily upon the construction of their cabins as proof of these elements. Generally, construction of a cabin, coupled with other acts consistent with ownership, may indicate open, continuous, and notorious possession.[85]  In this instance, however, it is critical to place the construction and use of these cabins in context.  The Greens had previously laid claim to the entirety of the Property.  The evidence shows that the entire Green family, which included Louie Jr. and Stacey, had used and occupied the Property.  Indeed, the Greens previously claimed that *they* had made "permanent improvements, storing their property upon, erecting fences and gates, evicting persons from the property, controlled all ingress and egress to the property, conducting extensive agricultural enterprises for their own use, and burying family members upon the property."[86]  They contended that *they* had acquired ownership of the entire Property through their separate actual, open, hostile, continuous and exclusive possession, over the same periods of time that the claimants say they have adversely possessed the Property.

---

[84]  *Nome 2000,* 799 P.2d at 309.

[85]  *Id.* at 308.

[86]  *In re Catholic Bishop of Northern Alaska,* 9 ABR at 351, 2010 WL 7506092, at *3.

Unlike the claimants, the Greens openly declared their ownership in bankruptcy court, and filed two state court actions – albeit the first was in violation of the automatic stay, and the second in disregard of the *Sales Order*. Yet, at no time did the Greens ever mention that their sons' families held, or claimed, an ownership interest in portions of the Property.

Claims of ownership acquired through adverse possession should, by definition, be known, or easily discovered, as the possession giving rise to the ownership must be open, notorious, and exclusive. While the claimants may have built cabins on the Property, as well as trails and bridges, and used their areas, this use and occupancy was consistent with the *family's* use and occupancy of the Property. There is no evidence that the claimants' use was distinguishable from or inconsistent with the Greens' use of the entire Property. Both CBNA and PSL were aware that the Green family, including the claimants, was using the Property. But, there is no evidence that the claimants used any part of the Property in an open, notorious, and exclusive manner that would contradict or defeat the Greens' purported use of the entire Property. In sum, the Greens' use and occupancy, and their separate claims of adverse possession as to the entirety of the Property, precludes a finding that the claimants occupied separate portions of the same Property, for the same use, over the same period of time.

Further, when PSL filed its claim in the Main Case in December of 2008, it described the Property as uninhabited. Its *Facts in Support of Pilgrim Springs, Ltd. Proof of Claim* states that, throughout the duration of the lease, there were "no inhabitants or permanent residents" within 60 miles of the Property.[87] Such a statement would not be made if the

---

[87] *See PSL's Proof of Claim No. 21*, at 9.

claimants, or the Greens, had possessed any portion of the Property in an open, notorious, and exclusive manner. Neither the Greens, nor PSL, who were in possession of the Property, had any notice that the claimants asserted adverse interests. For these reasons, the claimants cannot establish the necessary elements of their adverse possession claims.

### C.   Constructive Notice to the Claimants Was Sufficient.

The same reasons that preclude the claimants from establishing open, notorious, exclusive, and hostile possession also compel the finding that at the time of the sale, their interests were unknown to CBNA. Accordingly, I find that notice by publication was sufficient to apprize them of the *Motion to Sell*. Notice by publication may satisfy due process concerns "where it is not reasonably possible or practicable to give more adequate warning," such as in cases "of persons missing or unknown."[88] This commonly occurs in the area of mass tort claims, where a debtor may have no means to ascertain who holds claims against it. Courts have defined unknown claimants as those "whose interests or whereabouts could not with due diligence be ascertained."[89] Further, the party with the duty of giving notice is not required to make "impracticable and extended searches" to unearth unknown claimants.[90]

A creditor, or party in interest, is entitled to actual notice if his or her identity is either known or "reasonably ascertainable by the debtor."[91] The Supreme Court has instructed that

---

[88] *Mullane*, 339 U.S. at 317; *see also Tulsa Professional Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490 (1988)("For creditors who are not 'reasonably ascertainable,' publication notice can suffice."). Fed. R. Bankr. P. 7004(c) permits service by publication in limited instances.

[89] *Mullane*, 339 U.S. at 317.

[90] *Id.*

[91] *Tulsa Professional Collection Serv.,* 485 U.S. at 489-90.

one's identity is "reasonably ascertainable" if it can be discovered through "reasonably diligent efforts."[92]  Whether notice was reasonably given depends upon "whether the party giving notice acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice."[93]  Further, "it is reasonable to dispense with actual notice to those with mere 'conjectural' claims."[94]

The claimants have the burden "of proving a *prima facie* error in service."[95]  Yet, as discussed above, there is nothing that suggests that CBNA knew, or should have known, that Louie Jr., Stacey, or Mary, asserted ownership interests.  CBNA did know that they had cabins on the Property.  But, this use was consistent with that historically permitted by PSL.  Indeed, PSL confirmed to CBNA as late as 2006, that Louis Sr. was their "man in the field."  Months after CBNA rejected the PSL lease, the *Greens* first asserted an ownership claim in the entire Property by adverse possession.  They filed a quiet title action in Nome Superior Court before plan confirmation and sale of the Property, and a second quiet title action afterwards.  In both actions, they alleged that they had possessed the entire Property in the required continuous, open and notorious, and hostile manner to the exclusion of all others.  At no time did the Greens ever indicate that their sons, or Mary, held, or asserted, an ownership claim as to any portion of the Property.  Further, when Stacey and Mary were presented with the opportunity to inform CBNA of their ownership interest, they simply, and

---

[92] *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 804-05 (1983).

[93] *DePippo v. Kmart Corp. (In the Matter of DePippo),* 335 B.R. 290, 295 (S.D.N.Y. 2005)

[94] *Tulsa Professional Collection Serv.*, 485 U.S. at 490 (citing *Mullane*, 399 U.S. at 317).

[95] *Metzger*, 346 B.R. at 815.

politely, declined to pay rent. Given the facts and circumstances of this case, CBNA considered the Green family, including Louie Jr., Stacey, and Mary to be employees or agents of its lessee who remained on the property after the lease under which they were allowed onto the Property was terminated. There being no evidence that Louie Jr., Stacey, or Mary asserted any ownership interests, CBNA could not have known of their interests. Thus, constructive notice of the *Motion to Sell*, provided through publication of the sale in 12 Alaska newspapers, was sufficient.

## CONCLUSION

CBNA is entitled to an order compelling the Green family to vacate the Property. Louie Sr. and Nancy have not challenged the *Sale Order* or the *Judgment.* While the *Judgment* does not apply to Louie Jr., Stacey, or Mary, the Property was sold to Unaatuq, free and clear of their interests, under the *Sale Order.* They have not carried their burden to establish an ownership interest in any part of the Property through adverse possession. To the extent that they did hold some claim for adverse possession, their claims did not start to accrue as to CBNA until after termination of PSL's lease. More significantly, their claims were unknown to CBNA, as well as the Greens and PSL. For these reasons, publication notice of the proposed free and clear sale of the Property in the Nome Nugget and other Alaska publications was sufficient as to their interests. Accordingly, the *Sale Order* has extinguished whatever interests they may have had, and they must vacate the Property as well.

33

The court will, therefore, enter a separate order granting the *Motion to Enforce Judgment and Related Orders* and denying the *Request for Rule 60(b) Relief*.

Dated:  March 31, 2014

BY THE COURT

 /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve:      B. Moore, Esq.
            W. Dawson, Esq.
            R. Hume, Esq.
            M. Melchert, Esq.
            Bryon Collins, Esq., 310 K. St., Suite 200, Anchorage, AK 99501
            Louis Green, Sr., P. O. Box 1223, Nome, AK  99762
            Nancy E. Green, P. O. Box 1223, Nome, AK  99762